## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

In re:

TAYLOR, BEAN & WHITAKER MORTGAGE                Case No.: 3:09-bk-7047-JAF
CORPORATION,

    Debtor.

_____/

CERTAIN UNDERWRITERS AT LLOYD'S, LONDON
AND LONDON MARKET INSURANCE COMPANIES, *et al.*

    Plaintiffs,

v.                                                              Adv. Pro. No. 3:10-ap-243-JAF

TAYLOR, BEAN & WHITAKER MORTGAGE
CORPORATION, FEDERAL HOME LOAN MORTGAGE
CORPORATION, GOVERNMENT NATIONAL
MORTGAGE ASSOCIATION, and SOVEREIGN BANK,

    Defendants.

_____/

## ORDER GRANTING UNDERWRITERS' AMENDED MOTION FOR SUMMARY JUDGMENT ON TAYLOR, BEAN & WHITAKER MORTGAGE CORPORATION'S COUNTERCLAIM

    This proceeding is before the Court upon the Amended Motion for Summary Judgment on

Taylor, Bean & Whitaker Mortgage Corporation's ("TBW") Counterclaim (the "Motion") (Doc.

629), filed by Certain Underwriters of Lloyd's, London Market Insurance Companies [1]

(collectively, the "Underwriters"). TBW filed the Opposition to the Motion (the "Response")

---

[1] Unless otherwise noted, the term "Underwriters" refers to Plaintiffs, Certain Underwriters at Lloyd's, London and London Market Insurance Companies that subscribe to Certificate Nos. B0621PTAY00208, B0621PTAY00308, SUA 2896, B0621PTAY00207001, SUA 11239, B0621PTAY00408, SUA 11024, SUA 2664, P009560600, SUA 10837, SUA 2445, SUA 2387, P009560500, P009560501, SUA 10660, SUA 2251 and/or P00956004.

(Doc. 659). Underwriters filed the Reply (the "Reply") (Doc. 676). For the reasons stated therein, *Underwriters' Motion will be granted.*

## I.    Background

TBW and other entities suffered extensive monetary losses. Accordingly, TBW filed claims with its insurers, seeking to recover its losses under bonds and policies issued in August of 2008. On August 24, 2009, TBW filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, thereby commencing Case No. 3:09-bk-7047-JAF. Included in the assets of TBW's bankruptcy estate are fidelity bonds and insurance policies that cover TBW and other affiliated entities for various types of losses attributable to its employee's dishonesty (collectively, the "Bonds[2]"). On May 14, 2010, Underwriters initiated this multiparty adversary proceeding by filing a Complaint against, among other parties, TBW, seeking to confirm their rescission of the primary mortgage bankers bonds, first excess bankers bonds, and other liability insurance policies issued to TBW by Underwriters or, in the alternative, a declaration of no coverage.[3] Underwriters' rescission claim is based on the argument that TBW made material misrepresentations and failed to disclose material information when applying for the bonds and policies. In the Complaint, Underwriters explained that TBW submitted a preliminary proof of loss and a confidential proof of loss in support of its insurance claim under the 2008 Primary Bond and 2008 Excess Bond (the "2008 Bonds") asserting that it, and others, incurred financial losses attributable to the dishonest acts of TBW's employees covered under the 2008 Bonds. (Doc. 184 at 4-8, 28). In response, TBW filed a Counterclaim against, among other parties, Underwriters asserting a breach of the 2008 Primary Bond and 2008 First Excess Bond for the Underwriters' failure to cover TBW's losses.

---

[2] The Bonds are more particularly described in the Second Amended Complaint. (Doc. 184 at 2-3).
[3] The Complaint was subsequently amended by First Amended Complaint (Doc. 66) and by Second Amended Complaint (Doc. 184).

(Doc. 218 at 13-14). In the Motion, Underwriters claim that they are entitled to judgment as matter of law on TBW's breach of contract Counterclaim against them because TBW's losses were caused by the dishonest acts of a major shareholder, which are not covered by the 2008 Bonds. (Doc. 629 at 17-22).

## II.    Summary Judgment Standard

"[S]ummary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[4] Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (internal quotations omitted). The court's role is not to try issues of fact, but rather to determine whether issues exist to be tried. Balderman v. U.S. Veterans Admin., 870 F.2d 57, 60 (2nd Cir. 1989). "The moving party bears the initial burden to show . . . by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). "Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." Id. A moving party discharges its burden on a motion for summary judgment by "'showing'- that is, pointing out . . . that there is an absence of evidence to support the nonmoving party's case." Celotex Corp., 477 U.S. at 325. In determining whether the movant has met this initial burden, "the court must view the movant's evidence and all factual inferences arising from it in the light most favorable to the nonmoving party." Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny

---

[4] Federal Rule of Civil Procedure 56 is applicable to bankruptcy proceedings pursuant to Federal Rule of Bankruptcy Procedure 7056. Granting summary judgment is appropriate if, based upon the materials in the record, "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED.R.CIV.P. 56(a).

summary judgment." <u>Miranda v. B & B Cash Grocery Store, Inc.</u>, 975 F.2d 1518, 1534 (11th Cir. 1992).

### III    Analysis

In its Counterclaim, TBW claims that it suffered losses as a result of transactions and occurrences more particularly described in TBW's Verified Confidential Sworn Proof of Loss, which gave rise to coverage under the 2008 Bonds. (Doc. 218 at 10). TBW claims, among other things, that it suffered losses because Lee Farkas, the disgraced chairman of TBW, stole substantial sums of money from TBW. (Doc. 218 at 11).

In the Motion, Underwriters assert, and TBW does not dispute, that the losses for which TBW seeks coverage fall into eight primary categories. (Doc. 629 at 6-7). The largest component of TBW's claim, $30,136,795.00, seeks recovery for amounts owed by Farkas, and five of his business ventures (Thunder Flower, CPMG, Chisholm, Citrus Land Title, and Clear Title). (Doc. 629 at 7). The second category of TBW's claim, $25,076,181.00, seeks recovery for transfers of TBW's funds made on behalf of 3201 Partnership, "a company owned, in part, by Farkas." (Doc. 629 at 9). The third category of TBW's claim, $6,473,056.00, seeks to recover losses caused by transfers of TBW's funds made on behalf of Dine Design, "a series of companies" owned and operated by Farkas. (Doc. 629 at 10). The fourth category of TBW's claim, $2,630,165.00, reflects losses caused by transfers of TBW's funds made on behalf of South Towne Capital, another company owned by Farkas. (Doc. 629 at 11). The fifth category of TBW's claim, $94,942.00, seeks to recover losses caused by transfers of TBW's funds made on behalf of Uplead Technology, "a company owned (in part) by Farkas." (Doc. 629 at 13). The sixth category of TBW's claim, $19,376,575.00, is comprised of losses caused by transfers of TBW's funds made for the benefit of

other employee[5] owned entities, Roberson Construction, New Technology, Nada Airline, Marion Theater, and 24/7 Call Capture. (Doc. 629 at 13). The seventh category of TBW's claim, $1,801,470.00, are losses caused by transfers of TBW's funds for the benefit of Coda Roberson, a domestic partner of Farkas. (Doc. 629 at 14). The eighth category of TBW's claim is comprised of bonuses and other advances of TBW's funds to Desiree Brown totaling $1,565,452.00. (Doc. 629 at 15). In its Response, TBW does not indicate it is seeking coverage for any other losses. Accordingly, TBW seeks a total of $87,154,636.00 in coverage. (Doc. 629 at 7). TBW admits in its response that Farkas directed that approximately $87 million be taken from TBW's operating accounts for the improper financial gain of persons and entities that provided no value to TBW. (Doc. 659 at 22). Underwriters claim that Insuring Clause 1 of the 2008 Primary Bond does not cover any losses caused by Farkas' dishonest acts.[6] (Doc. 629 at 17). In order to address Underwriters' assertion, the Court must examine the language of the 2008 Primary Bond[7].

"[T]he parties may enter into any contract they desire, and they are bound by the language of that contract . . . no matter how disadvantageous that language later proves to be for one party or the other." Kel Homes, LLC v. Burris, 933 So. 2d 699, 704 (Fla. 2d DCA 2006)[8]. "The contract should be reviewed as a whole and all language given effect, and where the language is clear and unambiguous, the contract should be enforced as it reads." Leisure Resorts, Inc. v. City of West Palm Beach, 864 So. 2d 1163, 1166 (Fla. 4th DCA 2003). "[An] interpretation which gives a

---

[5] None of the parties specify what employees benefited from these transfers directed by Farkas or describe the circumstances surrounding the transfers.

[6] It is undisputed that beginning in 2002 Farkas, along with other individuals, began a number of different fraudulent schemes and through his fraudulent conduct, among other things, kept TBW in business. (Doc. 629-3 at 23).

[7] The 2008 Excess Bond provides that it is subject to same terms, exclusions, conditions, and definitions as the 2008 Primary Bond. (Doc. 629-2 at 6).

[8] The 2008 Primary Bond provides that TBW and the Underwriters agree that any dispute concerning the interpretation of the Bond is governed by Florida law. (Doc. 626-20 at 48).

reasonable meaning to all provisions of a contract is preferred to one which leaves a part useless or inexplicable." Premier Ins. Co. v. Adams, 632 So. 2d 1054, 1057 (Fla. 5th DCA 1994).

The plain language of the 2008 Primary Bond provides that Underwriters agreed to indemnify TBW for any direct financial loss sustained by it that was directly caused by "dishonest acts by any Employee of [TBW], whether committed alone or in collusion with others, which dishonest acts . . . resulted in the receipt of improper Personal Financial Gain for said Employee, or for the person(s) acting in collusion with said employee . . . ." (Doc. 629-1 at 9). Accordingly, any losses subject to coverage must be caused by the dishonest acts of TBW's employees.[9] The 2008 Primary Bond defines the term employee as follows:

Employee means:

(i) one or more of [TBW's] officers, clerks and other natural persons while employed in the regular service of [TBW] in the ordinary course of [TBW's] business and whom TBW compensates by salary, wages or commissions . . . and who the [TBW] has the right to govern and direct in the performance of such service, and

. . .

It is understood, however, that **the term Employee** does not include any **Major Shareholder** of [TBW], nor, except as provided above, any director of [TBW].

(Doc. 629-1 at 21). The plain language of the 2008 Primary Bond provides that the term employee does not include a major shareholder of TBW. A major shareholder is further defined as "a natural person who has or had directly, indirectly or beneficially 25% or more of the outstanding voting shares of TBW." (Doc. 629-1 at 22). Underwriters claim Farkas was a majority shareholder of TBW and for this reason any losses caused by his dishonest acts should not be covered pursuant to

---

[9] In order to hold an insurer liable on a fidelity bond, the loss claimed by the employer must have been caused by a person whose fidelity was insured under the bond, and that person must have been acting in the particular capacity or position for which his or her fidelity was insured.

the plain language of the 2008 Primary Bond. (Doc. 629 at 17-22). TBW does not dispute that Farkas owned a controlling interest in the corporation or that he was a majority shareholder of TBW. (Doc. 659). Thus, the Court finds these facts are undisputed for purposes of the Motion. Instead, TBW claims that even if Farkas was a majority shareholder, losses caused by his dishonest acts would still be covered because the 2008 Primary Bond specifically provides that it covers losses caused by acts of a majority shareholder if acting in the capacity of an employee.[10] (Doc. 659 at 10-17). In fact, Exclusion 1(e) of the 2008 Primary Bond bars coverage of "any loss involving any act of any partner or Major Shareholder of [TBW], except when acting in the capacity of an Employee." (Doc. 629-1 at 38). After reviewing the 2008 Primary Bond as a whole, it appears that the parties agreed the mere fact that a person owns 25% or more of the outstanding voting shares does not necessarily mean that such a person is immediately considered an employee. However, it stands to reason the parties recognized that a person who owns 25% or more of the outstanding voting shares of TBW may wear two hats, i.e. such a person can be both a majority shareholder and an employee of the corporation at the same time. Consequently, pursuant to the plain language of the 2008 Primary Bond, if a majority shareholder acted in the capacity of an employee of TBW and that person's dishonest acts caused losses, such losses could be covered by the bonds.

TBW claims that Farkas was acting in the capacity of an employee when he stole from TBW's operating accounts because he was directly involved in the business on a day-to-day basis and received a W-2 from TBW. (Doc. 659 at 13-14). Underwriters claim that Farkas could not be considered an employee nor act in the capacity of an employee because contrary to the

---

[10] TBW does not explain the difference between "being an employee" of TBW and "acting in the capacity of an employee" of TBW.

requirements of the 2008 Primary Bond, TBW had no right to "govern and direct" him. (Doc. 629 at 19-22). Underwriters did not present any evidence, such as corporate bylaws or a charter, which would establish whether Farkas was formally vested with the control of the business and property of the corporation. The deposition testimony of two witnesses established that TBW had a board of directors and officers, but there is no evidence showing whether they had any express powers to govern and control TBW's chairman. However, it is undisputed that, even if they had such theoretical powers, Farkas, as an executive officer, exercised such complete control over the corporation as to render the corporation's right to control him illusory. Delton De Armas, TBW's CFO, testified that TBW had a "wagon wheel organizational chart" in which everyone reported to Farkas. (Doc. 658-4 at 3). Farkas did not follow a traditional chain of command and would direct tasks to employees directly. (Doc. 658-4 at 3-4). Accordingly, De Armas explained if Farkas directed "you to do something then you did it. . . ." (Doc. 658-4 at 3-4). TBW's Federal Rule of Civil Procedure 30(b)(6) corporate representative testified that he did not recall an instance where TBW's board of directors did not allow Farkas to proceed with his proposed course of action. (Doc. 629-3 at 30). The board of directors also never reprimanded or restrained Farkas from taking any actions until he was asked to resign in August of 2009. (Doc. 629-3 at 30-31). TBW does not dispute the fact that Farkas had total dominance of the corporation for purposes of the Motion.

A majority view holds that a majority shareholder, who dominates his corporation, is not an employee of the corporation within the meaning of the term as it is used in the fidelity bonds insuring corporations against dishonest acts of their employees. See e.g., Tow v. Wohl (Matter of World Hospitality Ltd.), 983 F.2d 650 (5th Cir. 1993)[11]; First Nat. Life Ins. Co. v. Fidelity &

---

[11] Bonner v. City of Prichard, Ala., 661 F.2d 1206, 1207 (11th Cir. 1981)("[T]he decisions of the United States Court of Appeals for the Fifth Circuit (the "former Fifth" or the "old Fifth"), as that court existed on September 30, 1981,

Deposit Co. of Maryland, 525 F.2d 966 (5th Cir. 1976); Cal. Union Ins. Co. v. Am. Diversified Sav. Bank, 948 F.2d 556 (9th Cir. 1991); Kerr v. Aetna Cas. & Sur. Co., 350 F.2d 146 (4th Cir. 1965). That is because a corporation can only act through its officers and directors. World Hospitality, 983 F.2d at 652. As such "[w]hen one person owns a controlling interest in the corporation and dominates the corporation's actions, his acts are the corporation's acts." Id. "Allowing the corporation to recover for the owner's fraudulent or dishonest conduct would essentially allow the corporation to recover for its own fraudulent or dishonest acts." Id. "The [fidelity] bonds, however, were clearly designed to insure the corporations against their employee's dishonest acts and not their own dishonest acts."[12] Id.

The Court concludes that Underwriters established that Farkas dominated and controlled the corporation to such an extent that the corporation's independent existence was in fact nonexistent; Farkas became an alter ego of the corporation. See Vasquez v. YII Shipping Co., Ltd., 559 Fed.Appx. 841, 844 (11th Cir. 2014). For this reason, Farkas was not TBW's employee nor did he act in an employee capacity when he looted TBW's property. Accordingly, any losses caused by his dishonest acts are not covered by the bonds in question.

Alternatively, TBW claims that the above mentioned losses are still subject to coverage because the 2008 Primary Bond specifically provides that Underwriters agreed to indemnify TBW for losses causes by the dishonest acts of any TBW employee, committed alone or in collusion with others. TBW argues its losses were caused by the dishonest acts of Desiree Brown, TBW's

---

handed down by that court prior to the close of business on that date, shall be binding as precedent in the Eleventh Circuit, for this court, the district courts, and the bankruptcy courts in the circuit.").

[12]Additionally, it is important to emphasize that a fidelity "bond is intended to protect the corporation from the fraud or dishonesty of its employees, not to protect its creditors from the fraud or dishonesty of its stockholders and directors." Kerr, 350 F.2d 154-55.

Treasurer, and Delton De Armas, TBW's CFO, who colluded with Farkas.[13] (Doc. 659 at 16). In other words, TBW argues that it is entitled to recovery under the Bonds because Farkas did not act alone.[14]

### Dishonest Acts of Desiree Brown

TBW claims that Farkas used Brown, who as Treasurer managed the transfers of funds "in and out" of TBW, to withdraw funds from TBW's operating accounts. (Doc. 659 at 28, Doc. 658-3 at 6). TBW claims that whenever Farkas directed an electronic transfer, Brown authorized the wire and instructed that it be posted to a "Due From" account. (Doc. 659 at 28). For instance, on one occasion, Farkas e-mailed Brown with a request that she wire $725,000.00 to Harbor Auto Restoration for his car. (Doc. 658-3 at 31-33). Brown replied with an inquiry as to whether the funds should be accounted as due from him. (Doc. 658-3 at 31). Farkas replied, "I guess so. Boohoo" and added that in the old days he liked it when the accounting department didn't ask. (Doc. 658-3 at 31-32). Thereafter, the amount mentioned above was transferred from TBW's operating account to Harbor Auto Restoration. (Doc. 658-3 at 34). It is undisputed that corporate funds were used to support, among other things, Farkas' extravagant lifestyle. For instance, due to the diversion of funds from TBW's operating account, Farkas owned 20-30 collectible automobiles and was able to make a down payment on his jet. (Doc. 658-4 at 11; Doc. 658-10 at 69, 71). Farkas also managed and owned many unsuccessful business ventures such as restaurants, a gym, and a car wash. (Doc. 658-10 at 72). Brown wired TBW's funds to these companies upon Farkas' request. (Doc. 658-10 at 72). Farkas and Brown knew that many of their dishonest acts with respect to TBW's finances were illegal. (Doc. 658-3 at 22-23). When Brown questioned some

---

[13] TBW presented no evidence to establish either Brown or De Armas were TBW's employees pursuant to the employee definition contained in the 2008 Primary Bond. However, as Underwriters do not dispute these facts, the Court finds them undisputed for purposes of the Motion.

[14] TBW provides very little facts to explain Farkas' conspiracy with the other defalcating employees.

of their actions, Farkas assured her she would be fine because he would take the blame. (Doc. 658-3 at 23). Thereafter, Farkas signed an agreement on behalf of TBW forgiving himself, his related entities, and Coda Roberson, Farkas' domestic partner, of any obligations they might have towards TBW. (Doc. 659 at 26, Doc. 658-4 at 8-9). Farkas rewarded Brown for her cooperation by paying her an inordinate salary relative to her qualifications, bonuses, her son's tuition, and by providing other financial incentives with TBW's money. (Doc. 659 at 12). There is no showing that Brown acted without Farkas' direction or knowledge. The money was moved from TBW's operating accounts to Farkas or other entities as needed only at his direction.

The Court is faced with a very unusual situation where a majority shareholder, an alter ego of the corporation, initiates dishonest acts, directs his subordinate's involvement, and the subordinate renders her assistance in the fraudulent scheme. TBW claims that Farkas directed all of the transfers that caused its losses. Over time, the embezzlement on Farkas' behalf became part of Brown's duties. The Court believes that allowing coverage under these circumstances is not proper. See Transit Mgmt. of Southeast La., Inc. v. Grp. Ins. Admin., Inc., No. 96-1445, 1997 WL 639019 (E.D. La. Oct. 16, 1997). That is because allowing TBW to recover for losses caused by its alter ego's fraudulent or dishonest conduct only because its alter ego used his corporation's employee as an instrumentality in the fraudulent scheme would still essentially allow TBW to recover for its own fraudulent or dishonest acts. In addition, it would be inconsistent with public policy against allowing one to insure against one's own thefts, dishonest acts or intentionally inflicted damage. See Cal. Union, 948 F.2d at 566 ("[T]here is a public policy against permitting a corporation to collect insurance for the defalcations of its alter ego."). "An undertaking insuring a person against his own dishonesty would be, to say the least, a novel and unusual contract." Pereira v. Aetna Cas. & Sur. Co. (In re Payroll Exp. Corp.), 216 B.R. 344, 362 (S.D.N.Y. 1997) (internal

quotations omitted). Thus, TBW cannot recover for any losses caused by the dishonest acts of Brown committed at Farkas' direction.

Dishonest Acts of Delton De Armas

Lastly, TBW claims that its losses were caused by the dishonest acts of Delton de Armas who colluded with Farkas. TBW asserts that the "Due From" account was created by de Armas to track the amounts Farkas and Brown had taken from TBW's operating accounts and to give their defalcations an air of legitimacy with TBW's bookkeepers. (Doc. 659 at 27). Additionally, TBW claims that De Armas protected Farkas larcenous scheme by quelling any concern in TBW's accounting department. (Doc. 659 at 28). While it appears undisputed that the losses at issue were directly caused by Browns' dishonest acts directed by Farkas TBW does not explain how any of De Armas' acts, which were limited to preventing the detection of Farkas' scheme could directly cause "financial losses" as required by the 2008 Primary Bond. Specifically, TBW admits that the losses discussed in the parties' papers occurred when Farkas signed checks and directed Brown to wire funds from TBW's operating accounts. (Doc. 659 at 29). Moreover, TBW admits that Farkas and Brown had taken a substantial amount of money from TBW before De Armas began recording the transfers in the "Due From" account. (Doc. 659 at 27). Allowing TBW to recover for De Armas' attempts to prevent the detection of Farkas' scheme would in effect allow recovery for Farkas' fraudulent scheme. The Court will not condone such a result. Thus, the Court concludes Underwriters established and TBW failed to rebut that Underwriters are entitled to judgment as a matter of law on TBW's Counterclaim I and II.[15]

---

[15] In its Counterclaim, TBW claims that it suffered losses caused by many other acts of its employees. (Doc. 218). For instance, TBW claims that it suffered recoverable losses as one or more of its employees directed the transfer of funds of Ocala Funding LLC from the Ocala Funding collateral account in a manner inconsistent with the Ocala Funding commercial paper facility. (Doc. 218 at 11). In the Response, TBW fails to raise an argument that the Motion should be denied on the basis that there are other occurrences that caused TBW's recoverable losses. (Doc. 659). Thus, the

12

For the reasons stated above, the Court concludes that Underwriters' Amended Motion for Summary Judgment on TBW's Counterclaim I and II should be granted. The Court will enter separately Judgment in favor of Underwriters on TBW's counterclaim I and II.

**ORDERED**:

Underwriters' Amended Motion for Summary Judgment (Doc. 629) is granted.

**DATED** this ___19___ day of February, 2014 in Jacksonville, Florida.

**JERRY A. FUNK**
United States Bankruptcy Judge

Attorney, Denise D. Dell-Powell, is directed to serve a copy of this order on interested parties and file a proof of service within 3 days of entry of the order.

---

Court finds that TBW abandoned this argument for purposes of the Motion.